Mr. Gavitz. You got it right. I'm impressed. May it please the court, my name is Derek Gavitz. I represent the appellants of the Lighthouse Church and their pastor Kevin Brown. I'll be sharing some of my time today with the Department of Justice and I'd also like to reserve three minutes for rebuttal. The issue that brings us here today is a simple one. It's may a city enforce zoning codes that on their face exclude churches from a zone while permitting numerous forms of non-religious assemblies. We believe that the answer under Gallupa's equal terms provision as well as this court's pre-exercise cause precedence is no, that they may not engage in that unequal treatment. When we start with the Gallupa equal terms claim, Congress enacted that provision to address precisely the type of unequal treatment that appears on the face of Long Branch's zoning codes here. Although Senators Hatch and Kennedy, Ralupa's co-sponsors, don't always agree on much, they did agree that Ralupa's legislative hearings showed massive evidence that, quote, churches in general and new, small, unfamiliar churches in particular are frequently discriminated against on the face of zoning codes. They went on to point out that, quote, cities frequently exclude churches in places where they permit theaters, meeting halls, other places where large groups of people assemble for secular purposes. So to address this persistent and massive problem of unequal treatment of churches on the face of zoning codes, they enacted a straightforward prohibition, the equal terms provision. No government shall impose or implement a land use regulation that treats a religious assembly or institution on less than equal terms than a non-religious assembly or institution. In considering equal terms, should we consider the impact on liquor licenses that a church in a particular area will have? I don't think that that is a valid consideration in this case, though. In any event, the church here was willing to waive it. But the mandate of Cover-Lupa, which is the supreme law here, is to treat churches on equal terms with non-religious assemblies. But if a church comes in, under New Jersey law, you cannot have an establishment with a liquor license within 200 feet. And does that not prevent, if you're trying to create an entertainment district, that impact is going to be significant. I understand that waiving the liquor license means you've got to waive it for every application that comes in for a liquor license. It's not just the Lighthouse saying, I henceforth waive it. Because I think under New Jersey law, it's a particularized waiver which must be exercised for any application for a liquor license. But if you're trying to create an entertainment district, is it treating unequally establishments like churches, and I think schools too, that come in and prevent establishments that have liquor licenses from being permitted within 200 feet of them? Let me respond in a couple of ways. First, the redevelopment guidelines also do allow educational institutions. So presumably they're facing the same issue there. Those would be private schoolhouses, potentially, that would also potentially cause the same disruptive impact, if such a disruptive impact really does occur. Second, the city didn't do any studies of any sort, their redevelopment plan or anything, to show what impact, if any, churches would have on the redevelopment zone and their ability to create this vibrant community. So that's another issue. Third, I don't think RLUIPA allows you to use some other form of state law or local law to trump the supreme law of the land that says you cannot treat them unequally. Churches also are very often, or in most cases, always tax exempt. So if the city says we want to create a commercial district that's going to bring in tax revenue for the city, and by the way, we now have to exclude all churches to do that. Well, RLUIPA's mandate goes beyond whatever state law or local law imposes there and says you cannot treat churches on less than equal terms than non-religious assemblies. Let me ask you a couple questions, if I might. First, are you making only a facial challenge? I think our challenge is both. We are challenging the statute on its face, but this is a case where the statute was actually applied to us, both the older statute, the C1 ordinance, and the newer one, to actually prevent us from establishing a church. Let me read this to you from your reply brief, page 14. You're distinguishing the primary case, and you say it involved an as-applied challenge to a county's application of its ordinances, where, unlike here and Midrash, no disparate treatment of non-religious and religious assemblies existed on the face of the ordinance. Now, I guess you could read that two ways. One is that in Premier, they didn't have a facial challenge, and that's what you got here. Or it could be read as you saying, you're not doing an as-applied, and I'm just trying to figure out, are you making an as-applied as well as a facial challenge or not? Sure. Okay, well, we're not making the type of as-applied challenge that was involved in Premier, where, in that case, you could apply for, I think it was a variance or a special use permit, and they actually went through the process, were denied, and they claim we were treated unequally with somebody who went through a different process and was also denied. Here, we're saying you can just look at the actual, the face of the statute, and look at what they allow and what they don't allow, and conclude that there was unequal treatment. Sounds like a facial challenge. It is a facial challenge. My only qualifier is that, in a sense, it's not like a facial challenge where we didn't actually seek to be allowed in the district. You felt the pain of it. We felt the pain of it. We tried to get there, and they said, because of this statute, or because of our ordinance that doesn't allow you, you can't go there. Okay. And my second question was, what is the, what's the constitutional jurisdictional basis for the provision of the LIPA that you're trying to enforce here? What was Congress relying on when they enacted this? What do you, is this a Section 5 enforcement? Is this a commerce clause? What's the power behind this statute? Sure. Well, I'm happy to address this. That hasn't been an issue addressed so far in the briefing, but I'm happy to address it. I think what Congress was trying to do here in the Equal Terms Division was a Section 5 power. They were drawing on the prohibitions of the Free Exercise Clause, as well as the Establishment Clause, which both prohibit unequal treatment of religious uses as compared to secular uses, as well as 14th Amendment principles. So they're drawing on that, and in this case, Congress is entitled to go, you know, beyond that and enact prophylactically when they have compiled a record, as they did here, of massive evidence of unequal treatment on the face of zoning codes, and so they're not required to exactly track head chair's prudence. Okay, that's fine. You've answered my question. Under the ordinance, you're challenging both the ordinance and the revitalization plan in this case, correct? There are two ordinances. There's the C-1 ordinance, which was originally in effect when we first tried to get there in 2000. It has been superseded in some respects by the redevelopment guidelines, which didn't correct the problem, but further entrenched the issue of unequal treatment. Okay, but you're challenging both of those ordinances. We're challenging both of those, correct. Okay, under the first ordinance, clearly it appears that they treated secular assemblies and institutions differently than religious institutions. But under the second, can you explain to me how the second ordinance violates the equal terms provision? Well, once again, it sets out a category of permitted uses and prohibited uses. Churches fall into the prohibited use category, both in the text of the guidelines and the city has admitted in the brief on page 11 that churches are prohibited there. And then there are permitted uses that are allowed. Theaters, performance art venues, cinemas, educational institutions, all those and others qualify as secular forms of assembly. And actually, many of these are precisely the ones that Congress showcased in the legislative history as examples of ones that are non-religious assemblies that are frequently treated better than churches. Theaters is a prime example of that, as well as clubs and educational institutions. Again, what the district court did here to get around sort of the straightforward prohibition was it didn't want to give the plain meaning view or what it called the literal view. And so it added on several different requirements, one of which was the substantial burden requirement. The Department of Justice will be addressing that in a minute. It also argued that enforcing the equal terms treatment like this would give churches a free pass to go anywhere they want. That's not true. Cities frequently do design zoning districts where no forms of assembly are allowed and they can permissively do that. What they can't do is design a district where they do allow these forms of non-religious assemblies but exclude churches from them. You take the position, I think, that this is a strict liability statute. There's no strict scrutiny escape hatch, I think may have been your words. Correct. If that's true, does the statute actually go beyond what the legislative history indicates it sought to do, which was to codify pre-Smith, pre-exercise law? Because wasn't strict scrutiny a piece of that? Strict scrutiny is a piece in various instances. But the Congress is not limited in its Section 5 power to exactly mimicking the law. It is able to prophylactically go beyond that when there is evidence to justify that. How far do they get to go beyond that before a court would run into trouble in upholding it because you'd face the same problem that City of Bernie pointed out with respect to RFRA? That's a factor that depends on the evidence that is before the court. That's one of the factors that Bernie and other Section 5 decisions say that you look to. In this case, they had developed a record. And I think they could well determine that in this case, when there is this type of unequal treatment of assemblies, which are so very close to churches, that it's very likely that strict scrutiny defense is never going to be satisfied anyway. So they could conclude that it was rational to dispense with that inquiry in this case. I would say also that they've actually, in some ways, gone a little, in other respects, gone not as far as the Free Exercise Clause, for example, would go by limiting the equal terms provision to only the comparators or only non-religious assemblies or institutions. The Free Exercise Clause might look beyond to other comparators, but they've actually narrowed the statute to reach that respect. So in some respects, they've narrowed it, and in some, they've gone a little bit beyond. But there was certainly evidence from the legislative record to support that conclusion. And the city, in this case, has never argued to the contrary that there isn't such evidence. Thank you, Mr. Galbraith. We'll have you back on rebuttal, Mr. Kim. May it please the Court, my name is Juan Kim, and I represent the United States of America. The United States participates in this case's amicus curiae to make clear our view that the equal terms provision of RLUIPA does not require proof of a substantial burden on the exercise of religious liberty. The District Court's ruling to the contrary on this point seriously undermines, in our view, the appropriate application of RLUIPA, and it cannot be squared with the text, the structure, the purpose, or the legislative history of that statute. This is so, first and foremost, because of the plain language of RLUIPA. Congress clearly knew how to legislate the requirement of a substantial burden in that statute. It used that term no less than five times in the immediately prior section to Section B1, and that is Subsection A, which is titled Substantial Burden. Given that Congress clearly knew how to use that term and how to impose that requirement where it saw fit in Subsection A, it was improper to read such a requirement in Subsection B1, which does not incorporate that term and does not, in fact, speak to it at all. In fact, Subsection B1 is titled Equal Terms, and the plain language of Subsection B1 imposes no requirement that a substantial burden be proven to show a violation of equal terms requirement. Mr. Kim, does the United States have a position on whether this is a strict liability section, Section B? We do, Your Honor. We obviously did not participate in this case to express that opinion, but I will say that we have expressed our opinion on the appropriate application of B1 in the Midrash case in the 11th Circuit, which was argued some time ago. We do believe that once a violation of B1 has been met on its terms, the inquiry is complete. Now, we part ways a little bit from where the Beckett Fund, I think, would have this court go, because we think that proving a Section B1 violation is slightly different than the Beckett Fund does. We believe, for example, that there's four steps to the legal inquiry. I think all people accept that. The first step is, is there a land-use regulation? There is no dispute that there was a land-use regulation in this case. The second and third steps involve determining whether there's an assembly or institution on a secular one that is included and whether there's a non-secular one that is not included. Again, in this instance, I think there's some dispute as to whether there are assemblies or institutions, but I think we can posit for purposes of this case that there is a secular assembly that was included and a non-secular assembly that was not included. If that is so, the last step of the inquiry is, are they being treated, the religious institution or assembly, on less than equal terms? Now, we think that less than equal terms analysis involves some consideration of the governmental interest in including the secular assembly, and that is the position we argue before the 11th Circuit. Now, on that issue, I will say that we part ways with what the 11th Circuit did in that case. The 11th Circuit adopted a front-end inquiry of B1 that is, I think, identical to what the Beckett Fund would argue that B1 does. And I don't wish to speak for the Beckett Fund, but I'm trying to be responsive to the Court's question. That being said, I think the 11th Circuit then realized that that creates constitutional over-breath concerns, and therefore adopted a strict scrutiny analysis on the back-end. Now, we think that that strict scrutiny analysis comes from a cloth. It does not arise from the language of B1 at all. And so we question why that strict scrutiny analysis would have any place in B1, and I think it can be avoided if the Court takes… Yeah, you're just about to say it. How do you avoid it? I think that what the Court can do is do what it does in the Smith-Lacoumi, and in this circuit, the FOP, 10th Y, Blackhawk line of precedence, and adopt an analysis of the governmental interest. Because it is absolutely clear from legislative history that B1 was animated to incorporate, as much as possible, the Smith-Lacoumi line of precedence. And I think if you look at now Justice Alito's opinions for the Court in both FOP and Blackhawk, he enunciates that the comparison of secular interests and the government's interest in regulating and providing exceptions, for example, a beer in FOP, if that is so, what are the governmental interests in doing that? Is there a comparable religious interest that raises the same level of concern that is not included? That is the appropriate level of analysis, a comparison of the governmental interests. We think that is the appropriate level of analysis required in B1 under the less than equal terms provision. We think that kind of analysis and balancing will incorporate the appropriate level of review as contemplated by Congress. Let me just ask you one question on the substantial burden issue that you addressed. What about the utilization of the word substantially burdens in subsection B under burden of persuasion? Yes, Judge. Well, Your Honor, that merely says that whenever there is a substantial burden to be proved, this party has the burden of proving it. It does not incorporate a substantial burden in every element of RLUIPA. It simply allocates the burden of it has to prove it, not the way it must be proven. What about similarly situated? Well, Your Honor, I think that similarly situated is a fair analysis taken in dictionary meaning. The reason why I do not urge the court to use that kind of language interpreting B1 is similarly situated, of course, incorporates equal protection components. It is a creature of equal protection law. And people, when they use that term, immediately start looking to Claiborne and rational review, rational basis review. That is not what B1 was designed to do. The legislative history of B1 is very clear. It was intended to incorporate the Smith-Lacoumi free exercise jurisprudence. And it does not use similarly situated. It uses less than equal terms. Now, again, we are arguing semantics and notions here. I mean, less than equal terms means something. What does it mean? It means an equivalency. And again, the kind of equivalency I think this court underwent when it ruled in the FOP and Black Hawk cases. Let us look at the governmental interests. What are the governmental interests in including this type of assembly? And let us look at the excluded religious interests. How are they excluded when they raise or implicate the same types of concerns? We think that is the appropriate analysis. And again, if the court engages in that analysis, we think that there is no strict scrutiny required after the fact. And again, the 11th Circuit decision is quite different. It says basically in the front end, if there is a non-religious assembly, there must be. Is the weighing of government interests, does that pull us back toward questioning whether something is compelling and whether there is a substantial burden and things like that? Well, Your Honor, I think that there is a natural inclination to do that because now you are talking about free exercise jurisprudence. But I will say that I think we have to start from the first premise. And the first premise is what Congress wrote in B-1. And then I think there is two-step analysis, of course. What did Congress intend? And is what Congress intended constitutional? Now, what I think Congress intended to do is to incorporate free exercise clause jurisprudence as much as possible. But they did it in a narrow way and a broader way than free exercise jurisprudence typically is. They did it in a narrow way because, of course, as this court held in FOP, and I keep talking about that case because I think it is such a significant case, relief only applies to assemblies and institutions. It only applies to land uses. It does not apply to the whole broad category of things that the free exercise clause would cover, like wearing a beard or wearing a turban or other things like that or nailing a lechee on a tree. But it did so in a broader way because it found massive evidence of discrimination in the land use context for religious assemblies. And having found that massive evidence, it can find, to be congruent and proportional in the city of Burney, the fact that the remedy should be, if there is established to be less than equal terms, then the violation is complete. And there is no then strict scrutiny analysis after the fact. And I think that is where we differ with the ruling of the Midrash Court in the 11th Circuit. We think that they read it to be one requirement that simply is not there. Thank you, Mr. Kim. Thank you, Your Honor. Ms. Copeland. May it please the Court, my name is Audrey Copeland, appearing on behalf of the City of Long Branch. Your Honors, with regard to the strict scrutiny, I'd also posit something else in this case. With FOP and cases, the strict scrutiny cases, they were premised upon the application of a series of individual exemptions. Because that would make something that was neutral, not neutral in application. And I would say in this case, there's been no application of a system of individualized exemptions to even get to that issue. This case involves two zoning ordinance. The first one was the C1, which is now superseded. And the C1 ordinance permitted assemblies, which is the focus of their assembly argument. But that was broadly applied to the application submitted in 2000. Because the church applied as a church, not as an assembly, as this Court noted the first time around. So then the remedy was to apply for a variance. And same argument that maybe a variance procedure would then be the individualized exemption procedure. They never applied for a variance. So they never invoked the individualized exemption procedure as far as the first zoning ordinance. As a matter of fact, Ms. Copeland, are we looking at the redevelopment ordinance right now, where they did apply, they put an RFQ in, right, and were rejected? Isn't that, I guess my question is, as a matter of fact, didn't they ask for some individualized attention and weren't they given that and refused it? I would say no, Your Honor, with regard to the redevelopment ordinance or plan as well. Because they applied for two things. What's the RFQ if it's not an individualized assessment? It's somebody coming forward and saying, look at what I want to do, tell me whether it's okay, isn't it? I would agree in part with Your Honor. But in this case, the RFQ, request for qualifications of becoming a developer, was denied because the application was incomplete. And the other remedy sought was a waiver or amendment to the zoning plan to permit churches, as a rule, not just one church, but churches in general. So this wasn't one of those individualized exemption type of cases that you might see in the FOP case with the beard. Or say the Tenafly case, where you had polls that were not supposed to have things posted on them. But it wasn't enforced against things for non-secular uses, like a lost cat, but it wasn't enforced against the posting of the religious banners. Simply because there's a decision applying. How long have they been trying to get that church set up on Broadway? The first application was made in 1995, and it was just returned as incomplete. The second application, which was complete, under, again, the C1 zoning ordinance, was in 2000. And that one was returned, and it said, this is not a permitted use. They applied as a church, not as an assembly, as this Court has said before. And it said, you have to seek a variance, or else you can appeal this decision. Instead, they went to court. So 12 years down the road, is there any implication to be drawn, any inference to be drawn, about whether these folks are getting some individualized treatment by the city or not? You know, I don't think so, Your Honor. Because I think the case reflects a history of incomplete application process, and charging ahead to the courts. And, for example, there's no evidence on the record to ever say that had they applied for a variance, it would have been denied. Did they go to City Council and get rejected, thrown right out the door? The City Council was with regard to the redevelopment plan. And again, the RFQ was incomplete, and the development plan was a waiver. And that's part of the problem, again, with a liquor license issue. Because if you amend the plan to permit houses of worship, then you have a block full of churches, or possibly, each of them having to waive each new license that's applied for, or license that are transferred, revoked, and then reinstated. So it's a whole thing. It's not just the Lighthouse getting an individual variance for itself under the plan to operate there. It's allowing houses of worship in that zone. So I would just suggest that we don't even get to the individualized exemption thing because of those factors. And I think the first time this court heard the case... Can I ask a question? Does it matter what steps they took in light of the fact that they're making a facial attack on the ordinances? Well, I would say, I guess, no. So therefore... As this court said before, the ordinance is a facially neutral and generally applicable. It is. And this court said, unless there's any additional evidence, the case was sent back to the district court. There was an NPO. That doesn't bind us. Well, nothing's changed. The text of the ordinance hasn't changed. There's a new ordinance, the redevelopment plan. But when you look at what are the criteria for facially neutral and generally applicable? And that's if, in this case, for both of them, the church is only one of numerous uses not specifically permitted. And secondly, the purpose of the ordinance or the plan are not aimed at speech. How does that answer the Rulippa point, which is less than equal terms? Speak, if you would, to the assertion that's made by your opponent that, look, if they say it's okay to see Shakespeare, but it's not okay to see a preacher, that's a Rulippa problem. That's the fundamental question that's being presented to us. What's the response to that? Well, first we say that since both ordinances are facially neutral and generally applicable, there's no Rulippa problem there. Then I guess you have to go to the as applied. Isn't that, you say there's no Rulippa problem there. Isn't that what Rulippa, in fact, does say is a problem? That you can't say okay to have theaters, not okay to have churches? Well, you look first to see whether the ordinance is facially neutral. But then you go on to see whether a facially neutral ordinance is applied in a discriminatory fashion. And when you start with that analysis, that's when you need comparators. And in this case, again, you take the ordinances separately. You need to take the first ordinance. And in that case, the mission says their comparator would be an assembly, a non-secular assembly. But in this case, as this court said and the district court said, they never applied as an assembly. So really, it's a material here. It doesn't matter. Nor have they come back and now presented evidence that it's not facially neutral or evidence of a comparator or similar use. I guess I'm puzzled by your assertion that they haven't shown anything to show it's not facially neutral. I read the briefing. The argument they make is it's clearly not facially neutral because of the reason I articulated a minute ago. You can have all kinds of secular assemblies. And in fact, they approved RFQs for things like repertory theaters and cinemas. But they can't have churches. Is that not something that on its face is treating churches differently than commercial assemblies? If you're a commercial assembly, you're good. If you're a non-commercial religious assembly, not good. Isn't that different? Well, the plan doesn't say anything about non-secular assemblies. It says theaters. All the permitted uses are geared to the high-end entertainment, commercial, specialty retail district. I understand what you're saying you wanted to do. I'm not speaking to that at all. But I hear you agreeing that, yeah, the ordinance says theater is okay. Church is not okay. That's the facial disparity they're pointing to. And you just said they haven't shown anything to show there's a difference. Help me understand what you're saying. Isn't there a difference between the first ordinance and the plan? Yes, there are. In addition to answering Judge Jordan's question, would you address that? I ask that to your opposing counsel. I think there may be a significant fact in this case. The first ordinance, and I think I answered both questions, speaks to assembly, permits assemblies. It doesn't say non-secular assemblies. It says assemblies. The redevelopment plan is entirely different. It's a plan with design guidelines and different procedures and things like that. But it has a list of specific uses. Like civics, culinary schools. It doesn't say assemblies per se. I think that's where the difference lies between the two of them. Now, as to the first, since it never applies in assembly, they can't prove equal terms violation or free exercise violation. And as to the second, it doesn't include, doesn't have that general assembly category that the first one had. So... So by saying theaters, colleges, culinary schools, and not saying assembly, that's what saves the redevelopment program from any problem that the earlier ordinance might have had using the word assembly? That's a matter of statutory distinction here? Perhaps constitutional distinction? Well, it certainly differentiates it. I think it makes it more clear that there are certain permitted uses. And there are probably non-permitted uses. You've said that you think Lighthouse's claims are moot with respect to the superseded ordinance in your briefing. But they say that, well, they still have a damages claim under 1983 while the city was operating under the formal ordinance. And I guess that would raise some fees issues. You want to just tell me real quick what your response is to their it's not moot argument? My response to that would be that they never applied for a variance. And now they can't apply for a variance. So, for example, they never applied for this assembly. And now they can't, they never applied for a variance. And now they can't go back and apply as an assembly. So it's not, your point is not, oh, the ordinance is different, therefore it's moot. Your point is they never applied for variance under the old ordinance. And now they can't, and therefore it's moot. Go back to assembly. But isn't their facial attack, doesn't their facial attack save their claim? Because they're not saying this ordinance was a violation of RLUIPA and the free exercise clause as applied. But the ordinance is a violative on its face because it discriminated and treated unequally religious assemblies versus secular assemblies. Well, that's their claim. But if that's their claim, doesn't their remedy still remain? Well, they might have a remedy, but they, again, have to show that it was not facially neutral. If they showed it, then it wouldn't be moot. Possibly. Is it true the city doesn't enforce the standard city liquor licensing requirements in the redevelopment zone? I don't know quite what you mean by that. I know that there have been some instances where I guess they waived part of it. But when I say waived, I mean to permit more licenses in a smaller area rather than, and not as to churches or things like that. Well, that is my question. One of the arguments made in the briefing on behalf of the city is, gee, we can't let these people in because we've got this thousand-foot city ordinance on top of the New Jersey state ordinance. But then the response is, well, they're not enforcing it in the redevelopment zone anyway. As a matter of fact, is that correct or is it incorrect? The response is with regard to the city ordinance, and it's also with regard to promoting the goals of the zoning plan. So you're not enforcing it as long as it's doing what the city likes it to do, and that's bring things in. But you are enforcing it if it's something that you think is outside the city's plan for the zoning ordinance. Well, I'm not sure whether it's not enforcing it so much as, like, semi-repealing it or something to that effect. But in short, it promotes the goals of the redevelopment plan. One of the state statutes that's an issue, because the state statute is the one that prohibits the liquor licenses within the 200 feet, really does not allow any waiver. I thought there were two. I thought there was a city and a state. Correct. I'm just asking about the city one, and I think if I've understood you right, you're saying it's true, they're enforcing it in some regards to the extent they think it promotes, and they're not enforcing it in some regards to the extent they think not enforcing it will promote what they want with the redevelopment. Is that right? Well, it's relaxing it, I guess you would say. But I would also say that it's actually a stricter ordinance than the New Jersey State Ordinance. It prohibits the licenses within 1,000 feet as opposed to 200 feet. And really, it's the New Jersey statute that's, as Carl Turner, the assistant planning director, testified, is the one applicable here, the principle, the one here that they're concerned about with regard to the waiver. With regard to the schoolhouses, the redevelopment plan permits culinary schools, similar fashion design schools, music instruction, but it's not a zone where there are public schoolhouses. Can you have a liquor license under New Jersey State law within 200 feet of a public school? It says, no, no, the statute actually says public schoolhouse. So I submit there's certainly a difference there. You can't say, well, they allow schools in the redevelopment plan, but that's not true. They're not the public schoolhouses referenced in the New Jersey statute. Okay, Ms. Copeland, thank you very much for your argument. Thank you. And Mr. Govitz, on rebuttal. Just taking that last point first, the state law also says private schoolhouses in the text of it. Let me address a couple other points. With regard to not applying as an assembly hall, that was one of the issues that concerned this court the last time we were here. We went back and specifically asked, are churches, houses of worship contemplated as an assembly hall? The answer was no. And the city continues, never responded to that point at all in their briefs. But that admission makes it very clear that it didn't matter whether we applied as a church or as an assembly hall, under that C1 ordinance, we were not allowed. And that was unequal treatment under that ordinance. To address Ms. Copeland's point that Judge Jordan referenced, that your claim as the original ordinance is moot. Well, it's not moot for a couple reasons. One, we were entitled to damages. We are seeking damages. Two, we think, you know, we asked to be permitted as a church in 2000, and the only reason we were denied was because of the unequal treatment. If this is a facial, or if we determine this is a facial attack under the first ordinance rather than an as-applied attack, can you recover damages? We should have. If this statute were non-existent, if they had not done unequal treatment, we would have been allowed to go in and set up shop without any city permission whatsoever. But you didn't apply for a variance. Well, we didn't apply for the variance because that's the unequal treatment. I mean, assembly halls, whether they're profit or non-profit, didn't have to go through this, you know, arduous variance process. And we should have been setting up shop in 2000, or even earlier, just as an assembly hall could have, or as a theater could have. And that was the unequal treatment. So we believe we're entitled to both damages and injunctive relief as well. We should have been entitled to go in as of 2000. What would that get you now, injunctive relief now? What would that get you in light of the existence of a new ordinance? Well, we should have been there in 2000, but for the city's unlawful conduct. So I would say the court has applicable power to put the church in there today, regardless of any intermediary measures they've taken. You're saying the district court could do this if we reversed and sent it back? Yes, if you find that there's a violation of both the equal terms, either the equal terms or the free exercise clause. And, again, I would say the court doesn't have to necessarily reach out if there were any issues, because there is persistent unequal treatment under the redevelopment guidelines. Right. I understand what you're arguing there. Let me also address briefly some of the points that our partner Justice brought up. No, that's not rebuttal. I'm sorry. Okay. Well, then let me address one of the points that Ms. Copeland brought up on the FOP and Black Hawk. She claims that, or she suggested that those types of claims only involve ones where there are individualized exemptions. In fact, they identify two types of free exercise claims that give the right to district scrutiny. One is where there is an individualized discretionary system of exemptions. Another is where there is categorical preferential treatment of secular conduct over religious conduct. And we have shown that in this case as well. And, in fact, if the court wanted to avoid any thorny issues that might arise from applying equal terms statute, it could simply rule in favor of us only on the free exercise claim, which does have slightly, you know, may have more strict standards. But since we meet the stricter standard of the free exercise claim, we would obviously also meet the equal terms standard as well. Thank you, Mr. Copeland. Thank you. We thank CASEL for their very helpful arguments in this case, and we will take the matter under advisory.